UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

AMY E. S.[1],                                                     Case No. 6:20-cv-1997-AC

                              Plaintiff,                          OPINION AND ORDER

          v.

COMMISSIONER, SOCIAL SECURITY
ADMINISTRATION,

                              Defendant.

_____

ACOSTA, Magistrate Judge:

          Plaintiff Amy E. S. ("Plaintiff") filed this action under section 205(g) of the Social

Security Act ("Act") as amended, 42 U.S.C. § 405(g), to review the final decision of the

Commissioner of Social Security ("Commissioner") who denied her social security disability

insurance benefits ("Benefits").   The court finds the decision is not supported by substantial

---

[1] In the interest of privacy, this Opinion uses only the first name and the initial of the last name of
the non-governmental party in this case.

evidence in the record.   Because there are no outstanding issues to be resolved and it is clear from the record Plaintiff is entitled to Benefits, the Commissioner's final decision is reversed and remanded for immediate payment of Benefits.[2]

### Procedural Background

On or about December 31, 2017, Plaintiff filed an application for Benefits alleging an onset date of March 15, 2017.   The application was denied initially, on reconsideration, and by the Administrative Law Judge ("ALJ") after a February 5, 2020 hearing ("Hearing").   The Appeals Council denied review and the ALJ's decision became the final decision of the Commissioner.

### Factual background[3]

Plaintiff is thirty-two years old.   She completed her Ph.D. at the University of Oregon in 2019.   Her past relevant work experience is as a graduate teaching assistant in the linguistics department.   Plaintiff has not been involved in a successful work attempt since March 15, 2017. She alleges disability because of severe chronic fatigue syndrome ("CFS"), depression, anxiety, and other cognitive limitations that are worsened by over-exertion.   Plaintiff meets the insured status requirement entitling her to Benefits through December 31, 2022.

/////

I. Testimony

---

[2] The parties have consented to jurisdiction by magistrate judge in accordance with 28 U.S.C. § 636(c)(1).

[3] Plaintiff asserts the ALJ erred by improperly rejecting medical records, evidence, and testimony regarding symptoms and limitations relating to her mental health disposition, primarily a significant impairment in her ability to stay engaged for long periods of time without substantial mental and physical exhaustion.   Consequently, the court will concentrate its review on evidence relating primarily to this disposition.

Page 2  – OPINION AND ORDER

*A. Plaintiff*

In a Function Report dated June 26, 2018 ("Report"), Plaintiff described the impact of her

condition as follows:

> I have very low energy levels, so I am not able to sit or stand for very long before
> I need to lie down.   Often my muscles are too weak for me to hold anything, so I
> cannot do anything but lie in bed.   Even something as simple as a shower is very
> draining, and I usually have to lie down for a little while afterwards before I can
> get dressed or do any other activities.   I am able to concentrate for brief periods
> of time but then lose my ability to focus, and my memory does not retain
> information very well; even when I am able to read a book, I often cannot recall
> what I read even an hour later.   I had to quit working because I was only able to
> focus a few hours a week, and was not able to retain very much of what I was
> working on.
>
> If I overexert myself (which can happen if I walk just a couple of minutes longer
> than my body can handle), I become weak and confused, and my whole body
> shakes.   It takes days to recover, during which time I must spend almost all of
> my time horizontal.

(Tr. of Social Security Administrative R., ECF No. 15 ("Admin. R."), at 198.)

Plaintiff reported she cannot walk very far on her own and prolonged standing or walking

leads to dizziness and weakness.  (Admin. R. at 198.)   Plaintiff can drive but usually does not

feel alert nor strong enough to do so and must instead rely on rides from friends or family.

(Admin. R. at 199.)   In the report, Plaintiff described a typical day as follows: "I lie in bed for a

few minutes to an hour after waking up before I feel strong enough to get out of bed.   I eat a few

times during the day, almost always something a family member has prepared for me . . ..   I read

on my Kindle, because physical books are too heavy for me to hold. . ."   (Admin. R. at 198.)

Plaintiff reported she goes out to lunch or tea once every few weeks and will communicate

with friends up to an hour or two a day, though a few times a week has no energy for socializing

at all.   (Admin. R. at 200.)   She further noted the only place she regularly goes now is to her

doctors and is always given a ride to and from these visits.   (Admin. R. at 200.)   She cannot stand

for more than ten minutes before needing to sit or lay down, cannot sit for more than two hours before needing to lay down, has trouble concentrating for longer than thirty minutes to an hour before needing rest, and is sometimes unable to use her hands due to tremors and muscular weaknesses.   (Admin. R. at 200-201.)   She also reported her impairments affected her ability to talk, reach, walk, squat, complete tasks, understand instructions, and remember things.   (Admin. R. at 200.)   In her free time, she would crochet and cross-stitch, but not for more than half an hour total on a given day and would usually experience pain the following day.   (Admin. R. at 199.)

At the Hearing, Plaintiff testified she worked as a graduate teaching fellow at the American English Institute until March 2017.   (Admin. R. at 37.)   During this time, she was completing her doctoral dissertation which she successfully defended on November 22, 2019.   (Admin. R. at 50.) She testified she was able to work on her dissertation for approximately three hours a day on a "good day".   (Admin. R. at 41.)   When asked what a good workday looks like, Plaintiff testified it might include "sitting or lying somewhere, reading articles, re-reading articles to refresh my memory.   Sitting at my computer with my legs up on a footrest typing. . ..   [M]y memory is not as good as I'd like it to be, so I have to write everything down and then often revisit [my writing]." (Admin. R. at 50.)   Plaintiff also noted "I can't really lift anything that's more than a few pounds," and "there are times when my brother has had to carry me up the stairs, because I've been too weak to stand and walk." (Admin. R. at 46.)   She testified she sometimes resorts to communicating through grunts because she has difficulty remembering words and the effort of moving her jaw and tongue is too much at times.   (Admin. R. at 47.)

*B.  Plaintiff's Ph.D. Advisor*

In a witness statement dated January 28, 2020, Vsevolod Kapatsinski, Plaintiff's Ph.D. advisor, reported Plaintiff came to the program with "stellar recommendations and an excellent

Page 4  – OPINION AND ORDER

undergraduate honors thesis."  (Admin. R. at 248.)   He then described how her worsening fatigue-related impairments put her in jeopardy of finishing her Ph.D. on time, or at all for that matter.  (Admin. R. at 248.)   He explained she gave up her job as a graduate teaching assistant, thereby sacrificing her supplemental income and tuition waiver and incurring additional expenses. (Admin R. at 248.)   Finally, he noted she took several terms of medical leave even after stepping down from teaching, and eventually finished her dissertation, though it took her more than three years longer than is usual.  (Admin R. at 248.)   Kapatsinski applauded her perseverance and attention to detail throughout the process.   (Admin. R. at 248.)

>   *C.  Plaintiff's Mother*

In a third-party party function report dated August 19, 2018, Beckie, Plaintiff's mother, described Plaintiff's condition as follows:

> Personal care (shower, hair washing, dressing) takes up the majority of her available energy each day, and there are days she can only do that and it is usually early afternoon when she gets enough energy to attempt this.  Secondly, her ability to concentrate & retain information is severely compromised.  She is in bed after waking due to weakness & exhaustion.

(Admin. R. at 202.)

Beckie also reported Plaintiff "wakes up multiple times a night from twitching or pain or unknown reasons, she sleeps 10-13 hours a night [and] is just as tired in the morning."  (Admin. R. at 203.)   Beckie noted on nice days Plaintiff may go outside and lay on a chaise lounge for a few hours to get out of her bedroom, but when the weather is poor, the only time she left the house was for doctors' appointments or an occasional visit with a friend.   (Admin R. at 204.)

In a January 22, 2020 witness statement, Beckie stated "[Plaintiff] is not capable of living alone given her limitations.   The only housework she does is her laundry.   She prepares no food at all.   There are times she does not have the energy to even reheat food."   (Admin. R. at 244.)

Page 5  – OPINION AND ORDER

Beckie further explained "when [Plaintiff] overexerts herself, and it is very difficult for her to know from moment to moment what will be too much for her to do, she shakes, has a tremor, and has very limited cognitive function, focus or ability to concentrate." (Admin. R. at 244.) According to Beckie, even on a 'normal' day, Plaintiff's mental capacity will only allow for two to three hours of focused work. (Admin. R. at 244.) Beckie concluded Plaintiff remains hopeful she can find a job that allows the great flexibility necessary, and eventually work towards a more independent life because Plaintiff is "ferocious in her will." (Admin. R. at 244.)

### D. Plaintiff's Brother

In a witness statement dated January 27, 2020, Plaintiff's brother, Kevin, reported periods where the only thing Plaintiff could manage to do in a day was to feed herself meals their mother would prepare. (Admin. R. at 246.) He commented that despite the assistance from her family, Plaintiff is likely to be exhausted to the point of being bedridden following a long day of activity. (Admin. R. at 246.) He described how Plaintiff often uses a wheelchair during family outings. (Admin. R. at 246.) He also noted her doctoral studies were taking a physical and mental toll on her and two-to-three hours of work was all she could manage in a day, and the family had doubts she would be able to complete her studies. (Admin. R. at 246.)

/////

### E. Plaintiff's Father

In a witness statement dated December 17, 2019, Plaintiff's father, Ken, reported Plaintiff's disease varies in its severity. (Admin. R. at 240.) He described how in the winter of 2016, during a particularly severe episode, Plaintiff was bedridden for nearly twenty-three hours a day. (Admin. R. at 240.) He noted that even during less severe episodes her activities are very limited.

(Admin. R. at 240.)   Finally, he recounted a family trip to Portland where Plaintiff was pushed

around in a wheelchair for two hours and was still exhausted afterwards.   (Admin. R. at 240.)

II. Medical Evidence

    A.  *Treating Sources*

        1.  Kathleen K. Cordes, M.D.

 Plaintiff began treatment with Kathleen K. Cordes, M.D. ("Dr. Cordes"), in June 2017.

(Admin. R. at 308.)   In her visits with Plaintiff, Dr. Cordes repeatedly noted Plaintiff appeared

'alert and cooperative" and was able to maintain "good eye contact."   (Admin. R. at 296-308.)

During a September 6, 2017 visit, Dr. Cordes wrote "[Plaintiff] has been much worse for about

three weeks; she is really tired and has been sleeping for ~11 hours/day; feels like her brain is not

working—c/o problems with memory, recall, concentration, and body pain."   (Admin. R. at 306.)

    On February 7, 2018, Plaintiff reported to Dr. Cordes she had not been feeling very well

and was "only able to be upright for 1/2-1 hour/day for about a month" eventually improving to

up to three hours per day.   (Admin. R. at 302.)   Plaintiff reported pain in her neck, shoulders,

back, arms, and other joints at random.   (Admin. R. at 302.) During a visit on June 7, 2018,

Plaintiff reported very low energy and, although medication was helping, it allowed her to over-

exert which was followed by a prolonged recovery time.   (Admin. R. at 301.)   Plaintiff also

worried she would need to quit her Ph.D. program because she is able to function only a maximum

of five hours per week doing intellectual work.   (Admin. R. at 301.)   In a January 27, 2020

opinion letter, Dr. Cordes opined as follows:

> Due to chronic fatigue syndrome, [Plaintiff] spends most of her time in a
> recumbent position, and is able to be in a sitting or standing position for only a
> maximum of four to five hours a day.   She is able to stand for a total of
> approximately one hour of every 24, in a maximum of 15-minute increments.
> Although she recently graduated with her Ph.D., it took over eight years for her

> to accomplish this.   She took three medical leaves-of-absence, and was unable to
> work as a teaching assistant, attend conferences, and participate in meetings or
> other typical graduate activities during that entire eight years. . . .   The day after
> she has gone out of the house for an appointment, she typically must lie down for
> even more of the day than is usual for her.   It is obvious to me that unfortunately,
> [Plaintiff] is definitely unable to work full-time in any capacity.

(Admin. R. at 418.)

2.   Mary Sichi, Psy.D.

Plaintiff began treatment with Mary Sichi, Psy.D. ("Dr. Sichi") in late 2015.   (Admin. R.

at 293.)   Plaintiff repeatedly reported feeling tired and often anxious about the progress she was

making on her dissertation.   (Admin. R. at 429, 440, 442-44, 452-54, 458, 469.)   During a

January 28, 2019 visit, Plaintiff reported she had "[c]rashed in terms of energy for 1 1/2 weeks,"

and that she was bed-ridden for "longer than other recent crashes."   (Admin. R.at 442.)   She also

told Dr. Sichi she had not done any work towards her degree in the prior two months and had

emailed her advisor to let him know she may not finish at all.   (Admin. R. at 442.)   On November

21, 2018, Dr. Sichi submitted a mental residual functional capacity ("RFC") assessment in support

of Plaintiff's disability claim.   (Admin. R. at 289-294.)   In her assessment, Dr. Sichi noted

"[Plaintiff] has a strong tendency to over-estimate how much she can do especially when others'

expectations are involved.   This tends to lead to increased anxiety and self-criticism, which

decreases energy [and] productivity."   (Admin. R. at 292.)   She concluded her assessment with

the following:

> Because of her chronic fatigue, [Plaintiff] has to budget her energy daily for
> different activities, including physical, social and others such as hobbies.   Days
> of increased activity are followed by increased fatigue and need for rest.
> [Plaintiff]'s challenge has been to pace and/or decrease her activity. . . .
>
> Based on my observations of [Plaintiff] over the last few years, including frequent
> visible exhaustion within the therapy sessions, it is my opinion that she is not in a

position to work in any capacity.  In fact, employment would most likely be detrimental to her physical and mental health.

(Admin. R. at 294.)

   *B. Reviewing Sources*

      1.  Neal E. Berner, M.D.

   As part of the initial disability determination, non-examining physician Neal E. Berner, M.D. ("Dr. Berner"), reviewed Plaintiff's available medical records.  (Admin. R. at 60.)   In finding no disability, Dr. Berner concluded "[Plaintiff's] statements are not fully supported by the objective findings to preclude all work." (Admin. R. at 67.)   Dr. Berner found Plaintiff had the physical residual capacity to occasionally lift twenty pounds, frequently lift ten pounds, stand or walk for two hours, and sit for six hours of an eight-hour workday.  (Admin. R. at 68.)   He also noted Plaintiff had a tremor if she over-exerted herself and various symptoms that were not helped by her antiviral medication.   (Admin. R. at 68.)

      2.  Thomas W. Davenport, M.D.

   On reconsideration of the initial disability determination, Thomas W. Davenport, M.D. ("Dr. Davenport"), carried Dr. Berner's conclusions a step further.   (Admin. R. at 73.) Specifically, Dr. Davenport found Plaintiff's medical records showed grossly normal sensory and motor function, a normal gait, and normal strength, and therefore was "capable of medium exertion with environmental limits."   (Admin. R. at 79.)

   As to mental capacity, Dr. Davenport noted Dr. Cordes' notes suggested Plaintiff was "alert and cooperative", could maintain "good eye contact and a normal affect" and had "good recent and remote memory" during her appointments.  (Admin. R. at 79.)   Dr. Davenport concluded Plaintiff's RFC would allow her to occasionally lift fifty pounds, frequently lift twenty-

five pounds, stand or walk for six hours, sit for six hours, and did not limit her ability to push or pull within the weight limits described. (Admin. R. at 82-83.) He also concluded Plaintiff had no limitations in memory or understanding. (Admin. R. at 84.) In reconciling his determination with Dr. Sichi's November 21, 2018 medical opinion, Dr. Davenport explained, "[Dr. Sichi's] medical opinion is without substantial support from the medical source who made it, which renders it less persuasive." (Admin. R. at 86.)

III. Vocational Evidence

Frank Lucas ("Lucas"), an impartial vocational consultant, appeared at the Hearing, and classified Plaintiff's prior work as light work with a specific vocational preparation of eight. (Admin. R. at 53.) The ALJ asked Lucas if a hypothetical individual of Plaintiff's age, education, and work history who could stand for two hours and sit for six hours in an eight-hour day would be able to perform Plaintiff's graduate assistant work, to which Lucas answered no. (Admin. R. at 55.) The ALJ then asked whether there were other jobs this hypothetical individual would be able to perform, to which Lucas responded, "bench assembly type work, that would afford a sit stand option." (Admin. R. at 55.) He was able to identify three jobs in the national economy occurring in significant numbers that would afford this option. (Admin. R. at 55.)

The ALJ asked whether an individual who was unable to sit, stand, or walk for a combined eight hours a day would be afforded competitive employment. (Admin. R. at 56.) Lucas responded no, citing Social Security rules that treat eight hours as a full workday. (Admin. R. at 56.) When the ALJ added the additional restriction that the hypothetical person would be off-task ten percent of the time, Lucas responded this would exceed the acceptable limit for a person to be off-task and therefore would not afford employment opportunities. (Admin. R. at 56.) For a person off-task fifteen percent of the time the answer was the same. (Admin. R. at 57.) Lucas

Page 10  – OPINION AND ORDER

further testified a person who had difficulty arriving to work and had recurring absences outside of accrued leave would be unable to maintain employment.   (Admin. R. at 56.)

IV. ALJ Decision

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for Benefits.   20 C.F.R. § 404.1520 (2019).   At step one, the ALJ determines whether the claimant is currently engaged in substantial gainful activity, and if so, the claimant is not disabled.   20 C.F.R. § 404.1520(b).   At step two, the ALJ determines whether the claimant has a medically determinable impairment or combination of impairments as defined in 20 C.F.R. § 404.1520(c).   If the answer is no, the claimant is not disabled for purposes of the Act.   At step three, the ALJ determines whether the claimant has a combination of impairments that meet or equal a listed impairment that the Commissioner has determined are so severe as to preclude substantial gainful activity.   20 C.F.R. § 404.1520(d).   If the answer is no, then the ALJ proceeds to step four and, after making an RFC determination, decides whether the claimant can perform "past relevant work."   20 C.F.R. § 404.1520(e).   If the answer is no, then the ALJ moves on to the final step and determines whether there is other work within the claimant's RFC that exists in significant numbers in the national economy.   20 C.F.R. § 404.1520(f).   If such work exists, the claimant is deemed not disabled.

At steps one and two, the ALJ found Plaintiff suffered from the severe impairments of CFS, asthma, depressive disorder, and anxiety disorder, and that Plaintiff had not engaged in substantial gainful activity since the application date of December 31, 2017.   (Admin. R. at 15.) At step three, the ALJ found such impairments did not meet or equal the severity of any listed impairment and moved to step four.   (Admin. R. at 16.)

At step four, the ALJ identified assessments from Dr. Sichi and Dr. Cordes.  The ALJ also reviewed the assessments of the two non-examining medical consultants, Dr. Berner and Dr. Davenport, who each reached a different conclusion regarding Plaintiff's RFC.  (Admin. R. at 22.)  The ALJ discredited Dr. Sichi's and Dr. Cordes' assessments, citing their reliance on Plaintiff's self-reports of her condition.  (Admin. R. at 22.)  The ALJ found Dr. Berner's RFC determination to be persuasive and adopted it for purposes of steps four and five.  (Admin R. at 21-22.)  Accordingly, the ALJ concluded Plaintiff had the residual capacity to perform a range of light work in that she could lift twenty pounds occasionally and ten pounds frequently, could stand and walk two hours and sit for six hours in an eight-hour workday, and could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.  (Admin. R. at 17.)  Despite finding that the claimant's ability to perform a full range of light work was "impeded by additional limitations", the ALJ deemed Plaintiff capable of meeting the physical and mental demands of unskilled "light work" occupations where the work can be performed while seated or standing. (Admin. R. at 23.)  He concluded "the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy," and therefore a finding of no disability is appropriate.  (Admin. R. at 24.)

The ALJ specifically identified each medical assessment he used in reaching his RFC conclusions.  He assessed Dr. Cordes' statement as follows:

> Dr. Cordes provided a statement in January 2020.  "Due to chronic fatigue syndrome, [Plaintiff] spends most of her time in a recumbent position, and is able to be [in] a sitting or standing position for only a maximum of four or five hours a day.  She is able to stand for a total of approximately one hour of every 24, in a maximum of 15-minute increments."  Dr. Cordes recited the claimant's educational history and other information concerning driving and meal preparation described elsewhere.  "She is unable to participate in most social activities, going out for lunch only about once a month.  The day after she has gone out of the house for an appointment, she typically must lie down for even

more of the day than is usual for her.  It is obvious to me that, unfortunately, [Plaintiff] is definitely unable to work full-time in any capacity."  Such limitations may be based on the claimant's self-report of typical activity, but the medical record does not include observation of symptoms by treating sources such as weakness and diminished concentration and memory to corroborate the alleged limitations.   Therefore, Dr. Cordes' opinion concerning inability to sit, stand, and walk for a total of more than six hours in an eight hour workday is not persuasive.

(Admin. R. at 21.)   The ALJ then assessed Dr. Sichi's conclusions as follows:

[Dr. Sichi] provided a statement and completed a form in September 2018.   At that time, the claimant was working toward a doctorate degree less than an hour per day.   "She relies on family members for food preparation and often driving, as these activities of daily living would take a significant amount of her energy, leaving her with little for any other meaningful activity.   Dr. Sichi stated that "it is my opinion that she is not in a position to work in any capacity.   In fact, employment would most likely be detrimental to her mental and physical health."

On the form, the source assessed "severe" limitations, meaning the ability to function in the area was precluded and the individual would be "off task" more than 15% of the time in several areas.   This included maintaining attention and concentration for extended periods, performing within a schedule, maintaining regular attendance, be punctual within customary tolerances, and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.   Moderately severe ("off task" 11-15% of the time) limitations were assessed concerning understanding, remembering, and carrying out detailed instructions.   Moderate limitations were assessed in areas including interacting with the public, accepting instructions, and responding appropriately to criticism from supervisors, making simple work-related decisions, and sustaining an ordinary routine without special supervision.

The undersigned does not find this assessment persuasive.   The extreme limitations in concentration are not consistent with the ability to attain/complete a Ph.D. dissertation.   It is also not consistent with the lack of significant signs and symptoms per the treatment notes.   As noted above, Dr. Sichi would explicitly state when the claimant seemed more affected by fatigue, but this was infrequent.

(Admin. R. at 21.)

Finally, the ALJ discussed the persuasiveness of Dr. Berner and Dr. Davenport, as follows:

[Dr. Berner] indicated the claimant could lift and carry 20 pounds occasionally ad 10 pounds frequently, stand and/or walk two hours of an eight hour workday, and

sit about six hours of an eight hour workday.    All postural activities were limited to occasional.  On reconsideration, the claimant was found capable of medium exertion work with no climbing of ladders, ropes and scaffolds and avoidance of concentrated exposure to hazards and fumes, odors, dusts, gases, and poor ventilation, etc.

[Dr. Davenport's] reconsideration determination is not persuasive — [Dr. Davenport] does not adequately account for chronic fatigue syndrome despite accepting the condition as a severe impairment.  The undersigned does find [Dr. Berner's] determination generally persuasive, and the assessed limitations are including in the residual functional capacity to avoid over exertion that could exacerbate fatigue or asthma.

(Admin. R at 22.)

Regarding mental functioning, the ALJ concluded Plaintiff's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation with respect to the four broad areas of mental functioning commonly referred to as the "paragraph B" criteria.  (Admin. R. at 16-17.)  The ALJ found Plaintiff had no limitation in the first area of "remembering or applying information" supported by Dr. Cordes who repeatedly made notes of intact memory.  (Admin. R. at 16.)  The ALJ also found Plaintiff had a "moderate limitation in the second area of "interacting with others" and the third area of "concentrating, persisting, or maintaining pace."  (Admin. R. at 16.)  As to the fourth area of "adapting or managing oneself", the ALJ found Plaintiff experiences a mild limitation.  (Admin. R. at 16.)  As a result, the ALJ found that the paragraph 'B' criteria are not satisfied."  (Admin. R. at 17.)

*Standard of Review*

The Act provides for payment of Benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability.  42 U.S.C. § 423(a)(1). The burden of proof to establish a disability rests upon the claimant.  *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.), *cert. denied*, 519 U.S. 881 (1996).  To meet this burden, the claimant must

demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A). An individual will be determined to be disabled only if there are physical or mental impairments of such severity that the individual is not only unable to do previous work but cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A). At this step, the burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. *Distasio v. Shalala*, 47 F.3d 348, 349 (9th Cir. 1995). The claimant is entitled to Benefits only if she is not able to perform other work. 20 C.F.R. § 404.1520(f).

When an individual seeks Benefits because of disability, judicial review of the Commissioner's decision is guided by the standards set forth in 42 U.S.C. § 405(g). The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence" means "more than a mere scintilla, but less that a preponderance." *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Tylitzki v. Shalala*, 999 F.2d 1411, 1413 (9th Cir. 1993).

The reviewing court may not substitute its judgment for that of the Commissioner. *Robbins*, 466 F.3d at 882; *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). Thus, where the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld, even where the evidence can support either affirming or reversing the ALJ's

Page 15  – OPINION AND ORDER

conclusion. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). The reviewing court must consider the entire record, weighing both the evidence that supports and detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). However, a reviewing court may not affirm the Commissioner on a ground upon which the Commissioner did not rely. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007); *see also Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1225-26 (9th Cir. 2009) (*citing SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

*Discussion*

Plaintiff alleges the ALJ erroneously discounted evidence in the record at steps four and five of his decision. Specifically, Plaintiff asserts the ALJ erred in evaluating the assessments of Dr. Cordes and Dr. Sichi, and also failed to provide adequate reasons for discounting Plaintiff's personal testimony and other lay testimony. Plaintiff seeks an order reversing the Commissioner's final decision and "remand[ing] the case for immediate payment of benefits, or, in the alternative, for further proceedings." (Pl.'s Br. Supp. Compl. Review, ECF No. 16, at 20.) The Commissioner contends the ALJ properly considered the evidence in accordance with the Act and related regulations, and the decision should be affirmed. (Def.'s Br., ECF No. 18, at 10.)

I. Plaintiff's Testimony

A. *Physical Impairments*

Plaintiff provided extensive responses concerning her physical abilities in the Report. (Admin. R. at 190.) In this Report Plaintiff wrote she could not lift more than ten pounds, could not walk more than five minutes or stand more than ten minutes; could not climb stairs quickly;

Page 16  – OPINION AND ORDER

had difficulty squatting; had occasional difficulty using her hands; and could sit for only two hours before needing to lie down.   In assessing her credibility, the ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were "not entirely consistent with the medical evidence and other evidence in the record."   (Admin. R. at 19.)   He further found Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were inconsistent with her "demonstrated abilities in terms of schooling, travel, and social interactions."   (Admin. R. at 19.)

In evaluating a claimant's credibility, the ALJ must articulate what testimony is credible and what evidence undermines the claimant's complaints.   *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006); *see also Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (explaining the ALJ must articulate reasons with enough specificity to permit a reviewing court to conclude the credibility finding was not arbitrary).   Once a claimant has presented evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony as to the severity of symptoms based solely on a lack of objective medical evidence to fully corroborate the alleged severity of symptoms.   *Bunnell v. Sullivan*, 947 F.2d 341, 346-47 (9th Cir. 1991) (en banc).   Accompanying directives clarify that objective medical evidence is just one factor the ALJ considers in trying to corroborate the severity of a claimant's alleged pain.[4]

---

[4] The Commissioner issued Social Security Ruling ("SSR") 88-13 (superseded most recently by SSR 16-3p) interpreting 20 C.F.R §§ 404.1529 and 416.929.   Recognizing that "there are situations in which an individual's alleged or reported symptoms, such as pain, suggest the possibility of a greater restriction of the individual's ability to function than can be demonstrated by objective medical evidence alone," the Commissioner directs the ALJ not to "disregard an individual's statements about the intensity persistence and limiting effects solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual."   Other evidence to be considered include lay testimony, medical opinions, and treatment history.

In discrediting Plaintiff's testimony, the ALJ noted "Plaintiff's demonstrated abilities in terms of schooling, travel, and social interactions are inconsistent with her testimony about the intensity and persistence of her symptoms."  (Admin. R. at 19.)   With respect to travel, the ALJ identified several instances where the Plaintiff references spending time with friends or taking a family trip out of town and though he acknowledged she tended to report more fatigue following these trips, the ALJ still concluded "there [did] not appear to be instances where this resulted in extended periods of immobility," and thus was inconsistent with her allegations.   However, some of the notes the ALJ cites to directly contradict this conclusion.   For example, in a session with Dr. Sichi Plaintiff "[a]lso noted she enjoyed a family picnic for Mother's Day, but crashed the next day, with depressed mood and increased panic about not being productive."  (Admin. R. at 475.) In another session, Plaintiff reported an energy crash lasting a week and a half and told Dr. Sichi she needed a full day to recover after socializing with her boyfriend and his parents all day. (Admin. R. at 441.)   Plaintiff also reported a trip to the zoo with her dad and his girlfriend during which she used a wheelchair to avoid fatigue.   (Admin. R. at 477.)   After reaching out on social media to address her increasing feelings of isolation, Plaintiff reported to Dr. Sichi she felt overextended socially and would likely cancel some plans but was still proud of herself for reaching out to old friends.   (Admin. R. at 481.)   In another session, Plaintiff reported soreness from crocheting for too long the day before, and lingering fatigue and soreness from walking four blocks and sitting for three hours.   (Admin. R. at 446.)   The lay testimony also describes instances of long periods that Plaintiff was bed-ridden, most notably in the winter of 2016 where she was confined to her bed for twenty-three hours a day for some time.   (Admin. R. at 240.) There is further evidence Plaintiff often used a wheelchair during family trips and other outings where walking was involved.   (Admin. R. at 246.)

Page 18  – OPINION AND ORDER

Physical signs of persistent fatigue were also noted in the medical record.   The ALJ identified the examination notes of Paula Eschtruth, D.O. ("Dr. Eschtruth"), who treated Plaintiff for "muscular-structural problems" and observed "restricted" mobility in various joints, "increased muscle tension and tenderness," and "strain patterns." (Admin. R. at 378-379.)   The ALJ also noted Plaintiff's elevated levels of the Epstein-Barr antibody, a common correlate of CFS. (Admin. R. at 20.)

There is considerable evidence in the record that detracts from the ALJ's conclusion and the ALJ did not explain how he weighed most of this evidence.   Plaintiff's accounts of her daily activities do not contradict her other testimony, and in fact are largely consistent with CFS. Plaintiff's demonstrated abilities as relayed by Dr. Sichi's treatment notes are also consistent with CFS and with Plaintiff's own testimony.   Throughout her treatment, Plaintiff described relatively sporadic social events punctuated by long periods of rest and often followed by pain and fatigue. In certain appointments, Plaintiff seemingly experienced fewer or less severe symptoms, but courts have repeatedly recognized that CFS is characterized by periods of exacerbation and remission. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (citing *Cohen v. Secretary of Dept. of Health & Human Servs.*, 964 F.2d 524, 530 (6th Cir. 1992).   The ALJ's characterization of Plaintiff's daily activities downplayed the Plaintiff's relatively long recovery times following most activities, and instead focused on the fact that she tried to stay active within her limitations.   Courts have recognized that disability claimants should not be penalized for attempting to maintain a sense of normalcy in their daily activities.   *Reddick*, 157 F.3d at 722 (citing *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987)) (noting that a disability claimant need not "vegetate in a dark room" to be deemed eligible for benefits).

The ALJ also found "multiple points in evidence tend to refute the claimant's alleged inability to consistently attend even a simple, exertionally [sic] restrictive job." (Admin. R. at 20.) In lieu of identifying any such evidence, the ALJ took administrative notice that Plaintiff did not cancel any appointments with her physician. (Admin. R. at 20.) According to the ALJ, Plaintiff's failure to cancel any of her intermittent appointments with Dr. Sichi "tends to suggest that fatigue related malaise did not interfere with maintaining appointments."[5] (Admin. R. at 20.) This conclusion erroneously ignores a substantial portion of the lay witness testimony and Plaintiff's own testimony, again without explanation. Plaintiff and her academic advisor testified to her increasing inability to attend meetings and other obligations of a graduate teaching assistant, culminating with her resignation. (Admin. R. at 248.) Plaintiff, both of her parents, and her brother all testified fatigue-related malaise kept Plaintiff bed-ridden for long periods of time, which would certainly interfere with maintaining appointments. (Admin. R. at 202, 240, 244, 246.) But even if the ALJ correctly concluded Plaintiff's fatigue does not interfere with her ability to maintain a bi-weekly doctor's appointment, this does not by itself suggest an ability to meet the continual demands of a full-time job.

### B. Cognitive Impairments

In assessing Plaintiff's mental impairments, the ALJ weighed Dr. Sichi's assessment which indicated that Plaintiff had various severe or moderately severe cognitive limitations such that she would be "off task" when significant periods of concentration and memory were required.

---

[5] As a practical matter, a Social Security claimant's ability to keep her doctor's appointments, without more, should not weigh against their claim. By this logic, the Plaintiff should have been less diligent in seeking treatment for her conditions. This creates a paradox, because an unexplained failure to seek treatment or follow a prescribed treatment course can weigh against finding a disability, too. See *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

(Admin. R. at 21.)   The ALJ discounted Dr. Sichi's assessment, instead concluding "extreme limitations in concentration are not consistent with the ability to attain/complete a Ph.D. dissertation."   (Admin. R. at 21.)   He also noted Dr. Sichi did not include observations of fatigue in her notes very often, though he acknowledged that her notes did include some.   (Admin. R. at 21.)

Here again, the ALJ's conclusion is inadequately supported by his reasoning and ignores without explanation much of the evidence in the record.   To reach his conclusion, the ALJ decontextualized Plaintiff's completion of her Ph.D. dissertation.   First, as the ALJ acknowledged, Plaintiff took an additional three years to complete her Ph.D. dissertation. (Admin. R. at 19.)   At the Hearing, Plaintiff explained that she had difficulty remembering her own research, and a lot of her work time was spent re-reading articles and her old notes.   (Admin. R. at 50.)   According to Plaintiff, a day where she could work for three hours was a "good day," but she would not have energy left for anything else.   (Admin. R. at 41.)   Plaintiff's advisor also provided a statement laying out numerous additional accommodations Plaintiff received in pursuit of her degree, including multiple terms of medical leave.   (Admin. R. at 248.)   Second, in multiple sessions with Dr. Sichi, Plaintiff expressed worry about her ability to complete her degree at all.   In fact, multiple points in the record indicate she had decided to discontinue her studies unless her circumstances changed in some way.   (Admin. R. at 301, 473.)   Third, Plaintiff made significant sacrifices, including extended periods of medical leave, and eventually quitting her job, to complete her dissertation on her own extended timeline.   (Admin. R. at 248.)   The financial cost of this decision was twofold because not only did she forfeit her income, but also a significant tuition waiver that accompanied it.   (Admin. R. at 248.)   The circumstances under which Plaintiff

completed her degree are consistent with her complaints of cognitive and physical limitations attributable to CFS.

The second reason the ALJ provided for rejecting Dr. Sichi's assessment is also unsupported by substantial evidence. The ALJ identified several instances where Dr. Sichi observed Plaintiff fatigued during appointments but concluded that because her observations of fatigue were not more frequent, they did not support her assessment. (Admin. R. at 20.) Not only did the ALJ substitute frequency for consistency, but he also ignored the numerous instances of corroborating medical evidence in Dr. Sichi's notes and in the remainder of the medical record. The ALJ identifies several instances in the medical record where treating physicians noted Plaintiff's observable fatigue. (*See* Admin. R. at 20) ("[Dr. Sichi] would document times where the claimant appeared tired (Ex. 13F/50-51, 35-36, 33-34, 31-32)"). The notes he cites are Dr. Sichi's observations such as "[Plaintiff] reported and appeared to be very tired, immediately laying on the couch which she did throughout the session and appearing to have very little energy with a few moments of exception" (Admin. R. at 469); "[Plaintiff] appeared exhausted and drained" (Admin. R. at 454); and "[Plaintiff] appeared tired, walked slowly" (Admin. R. at 452.). Beyond their relative frequency, the ALJ did not adequately explain how these pieces of medical evidence are inconsistent with Dr. Sichi's conclusions.

In sum, the ALJ improperly discredited Plaintiff's testimony without adequate explanation. The evidence in the record largely substantiates Plaintiff's testimony, and the ALJ did not sufficiently identify the inconsistencies on which his conclusion was based. The ALJ's credibility findings are not supported by substantial evidence with respect to the record as a whole.

II. Residual Functional Capacity

At step four of the Commissioner's evaluation process, the ALJ must make a finding of the claimant's RFC despite their impairments, and then must determine whether the claimant can perform any past relevant work.   20 C.F.R. § 404.1520(e).   Having discredited the statements provided by Dr. Cordes and Dr. Sichi, the ALJ almost exclusively relied on Dr. Berner's report to reach his conclusion.   Both Dr. Cordes and Dr. Sichi agreed that due to her various impairments, Plaintiff is unable to work full-time in any capacity.   (Admin. R. at 21.)   As described above, the two non-examining medical consultants, Dr. Berner and Dr. Davenport, each reached different conclusions regarding Plaintiff's RFC based on a review of the medical record.   Determining that only Dr. Berner's assessment was persuasive, the ALJ concluded Plaintiff had the capacity to sustain a range of "light work," though impeded by "additional limitations."   (Admin. R. at 22-23.)   Specifically, he found Plaintiff could lift twenty pounds occasionally, ten pounds frequently, stand and walk for two hours and sit for six hours in an eight-hour workday, and sustain simple routine tasks but not complex tasks.   (Admin. R. at 23.)   In an attempt to reconcile his conclusion with the drastically incompatible evidence and testimony from Plaintiff, her family, her advisor, and her treating physicians, the ALJ explained:

> [T]here is a difference between sustaining mentally draining work that goes into completing post-graduate studies and engaging in simple and routine tasks described in the residual functional capacity, particularly with the additional restrictions including preforming the work largely from a seated position, having little contact with others, and only occasionally needing to preform postural activities.

(Admin. R. at 22.)

This explanation does not adequately explain the propriety of discounting most of Plaintiff's relevant and well-evidenced physical and mental limitations.   Dr. Cordes reported Plaintiff is able to stand only for approximately one hour of every 24, in a maximum of fifteen-

Page 23  – OPINION AND ORDER

minute increments.   (Admin. R. at 418.)   She concluded that: "[d]ue to [CFS], [Plaintiff] spends most of her time in a recumbent position and is able to be [in] a sitting or standing position for only a maximum of four or five hours a day. . . unfortunately [Plaintiff] is definitely unable to work full-time in any capacity."   (Admin. R. at 418.)   The ALJ concluded Dr. Cordes' assessment was unpersuasive, reasoning that her opinion was based on Plaintiff's complaints but "the medical record does not include observation of symptoms by treating sources such as weakness and diminished concentration and memory to corroborate the alleged limitations." (Admin. R. at 21.)

Discounting medical opinions from treating sources on the basis they rely on a claimant's subjective complaints runs counter to the Center for Disease Control's ("CDC") published framework for evaluating CFS.   *See Reddick*, 157 F.3d at 726 (finding ALJ's rejection of the treating physicians' assessments on premise they were based on the subjective complaints of the claimant ill-suited to CFS cases).   The CDC's framework defines CFS as "self-reported persistent or relapsing fatigue lasting six or more consecutive months."   *Id.*   The court in *Reddick* noted that while CFS is often accompanied by headaches, memory problems, and body-aches, "the presence of persistent fatigue is necessarily self-reported."   *Id.*   Additionally, the ALJ acknowledged that the treatment notes of Dr. Sichi, Dr. Eschtruth, Dr. Cordes, and Karla Marvich PMHNP included numerous observations of symptoms attributable to fatigue which further supports Plaintiff's self-reported persistent fatigue.   (Admin. R. at 21.)

Dr. Sichi's assessment concluded activities of daily living leave Plaintiff with very little energy for any other meaningful activity.   (Admin. R. at 21.)   As discussed above, the ALJ found Dr. Sichi's assessment unpersuasive because Plaintiff obtained her Ph.D. and because it was "not consistent with the lack of significant signs and symptoms per the treatment notes (Ex. 13F)."

(Admin. R. at 21.)   Dr. Davenport found Plaintiff was capable of "medium exertion work", though the ALJ discredited this finding.   (Admin. R. at 22.)

In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record, including, *inter alia*, medical records, lay evidence, and "the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment."   *Robbins*, 466 F.3d at 883, *citing* SSR 96-8p, 1996 WL 374184, at *5; 20 C.F.R. § 404.1545(a)(3); *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996).   The RFC determination must account for both physical and mental limitations of the claimant.   20 C. F. R. § 404.1545(a)(4).   The ALJ's process for determining Plaintiff's RFC bore substantial similarity to the ALJ's process in *Reddick* in which the ALJ discredited two assessments provided by the claimant in favor of two opinions provided by Social Security consulting examiners.   *Reddick*, 157 F.3d at 725.   The court in *Reddick* found the ALJ's RFC determination effectively ignored the key symptom of CFS, which is persistent fatigue.   *Id.* at 724.   The court reasoned the ALJ is required to evaluate the claimant's ability to work on a *sustained basis*.   *Id.* (citing 20 C. F. R. § 404.1512(a)) (emphasis added).   The court also noted "[o]ccasional symptom-free periods – and even the sporadic ability to work – are not inconsistent with disability."   *Reddick*, 157 F.3d at 724 (citing *Lester*, 81 F.3d at 833).

Outside of Dr. Berner's brief report and Plaintiff's receipt of her Ph.D., the ALJ did not identify any other evidence he relied on in concluding that Plaintiff would be able to sustain seated work for eight hours a day, attend a full-time job on a sustained basis, remember tasks and maintain concentration, and work with her hands for eight hours a day on a sustained basis.   The ALJ also did not convincingly reconcile his conclusion with the many points in the record that contradict it, including Plaintiff's own testimony, statements from her treating physicians, medical treatment

notes and tests, her academic advisor's statement, her psychologist's assessment, and her family's testimony.

Plaintiff testified she is unable to sit for more than a few hours before needing to lie down. (Admin. R. at 200.)   She testified on her better days she can manage to be upright and more involved for up to six hours if her activity is not mentally taxing.   (Admin. R. at 43.)   According to the vocational expert, this still would not afford the opportunity to work full time.   (Admin. R. at 56.)   Plaintiff also testified that if she uses her hands for too long, her hands become sore or shaky, and described limiting her crocheting to no more than half an hour total on a given day. (Admin. R. at 199.)   The ALJ found this not credible because he did not observe tremors during the Hearing, and the medical record contained no observations of shaking.   (Admin. R. at 20.) However, Plaintiff's medical records contain repeated complaints of tremors to her treating physicians and psychologists, and she explicitly correlates the tremors with physical exertion such as crocheting or typing.   (Admin. R. at 47.)   Presumably, Plaintiff would not be working with her hands very often during doctor's appointments, but she would have to do so at any of the jobs the ALJ concluded are available to her.   (Admin. R. at 23.)

In sum, the ALJ's RFC finding is not supported by substantial evidence in the record.   The ALJ does not explain how he weighed the conflicting evidence provided by Plaintiff's treating physicians and Dr. Berner.   Reliance on a lack of objective medical evidence without more is insufficient to justify discrediting all the evidence that supports a more restricted RFC.

III. Vocational Expert

After concluding Plaintiff was unable to perform her past relevant work, the ALJ proceeded to step five to determine whether there was other work that existed in significant numbers that she could perform.   He identified three bench assembly-type jobs that he considered within Plaintiff's

Page 26  – OPINION AND ORDER

RFC.   (Admin. R. at 23.)   As discussed above, at the RFC stage the ALJ erroneously discounted both Plaintiff's mental and physical limitations.   (Admin. R. at 20-23.)   This error followed to step five.

At the Hearing, the ALJ asked the vocational expert a series of hypothetical questions about the likelihood of retaining a job with Plaintiff's alleged limitations.   (Admin. R. at 54-56.)   The ALJ questioned Lucas about the implications of being "off task" for significant portions of the workday, consistent with Plaintiff's alleged physical and mental limitations.   Lucas testified an individual who could not sit, stand, and walk for a combined eight hours a day would not be able to engage in competitive employment.   (Admin. R. at 55-56.)   The expert also testified that if an individual were "off task" for more than thirty minutes outside of normal breaks, they would not be employable.   (Admin. R. at 56.)   Finally, he testified that if an individual missed more than one day or work per month on an ongoing basis the individual would not be employable.   (Admin. R. at 56.)   Plaintiff testified she does not drive and has significant trouble using public transportation because of the walking it involves, and thus relies on her family to drive her to appointments.   (Admin. R. at 35, 43.)   The ALJ's hypothetical questions to the vocational expert were consistent with Plaintiff's evidenced limitations, and the vocational expert confirmed these would render a claimant unemployable and thereby disabled for purposes of the Act.   (Admin. R. at 56.)   The ALJ does not provide any reasons for discounting these dispositive factors, and effectively discounting most of the vocational expert's testimony.   The ALJ's conclusion at step five is not supported by substantial evidence in the record.

IV. Remand

The decision whether to remand for further proceedings or for immediate payment of Benefits is within the discretion of the court.  *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir.

2000), *cert. denied*, 531 U.S. 1038 (2000).    The issue turns on the utility of further proceedings. A remand for an award of Benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed, and the evidence is insufficient to support the Commissioner's decision.    *Strauss v. Comm'r*, 635 F.3d 1135, 1138-39 (9th Cir. 2011) (*quoting Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004)).    The court may not award Benefits punitively and must conduct a credit-as-true analysis to determine if a claimant is disabled under the Act.    *Strauss*, 635 F.3d at 1138.

Under the "credit-as-true" doctrine, evidence should be credited, and an immediate award of Benefits directed where: (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.    *Id.*    The "credit-as-true" doctrine is not a mandatory rule in the Ninth Circuit but leaves the court flexibility in determining whether to enter an award of Benefits upon reversing the Commissioner's decision.    *Connett v. Barnhart*, 340 F.3d 871,876 (9th Cir. 2003) (citing *Bunnell*, 947 F.2d at 348.)    The reviewing court should decline to credit testimony when "outstanding issues" remain.    *Luna v. Astrue*, 623 F.3d 1032, 1035 (9th Cir. 2010).

Here, the ALJ erroneously discounted many of Plaintiff's well-evidenced and dispositive limitations without adequate explanation.    The ALJ also discounted without explanation most of the vocational expert's testimony with respect to limitations that would render a claimant unemployable.    The Commissioner argues further proceedings are appropriate because there is an outstanding conflict between Dr. Berner's conclusion and the conclusions of Dr. Cordes and Dr. Sichi.    Dr. Berner's report provides no explanation as to how he determined Plaintiff was able to

Page 28  – OPINION AND ORDER

sit for six hours and stand for two hours in an eight-hour day.  (Admin. R. at 68.)  The ALJ already had the opportunity, and indeed the obligation, to explain why Dr. Berner's unexplained conclusions were more persuasive than the other well-evidenced medical opinions and erred in doing so.   The record is thoroughly developed, and further development would not aid in resolving this conflict.   Where there are no issues remaining that the ALJ did not address, further proceedings are not necessary.  *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004).   The ALJ's decision specifically addressed the central issue remaining, whether Plaintiff retains residual capacity to perform limited light work, erroneously concluding she did.   The court does not need to return the case to the ALJ to make a second RFC determination on the same record.  *See Benecke,* 379 F.3d at 596 (allowing Commissioner to re-decide RFC issue when record clearly established claimant could not perform a sedentary job creates an unfair 'heads we win; tails let's play again' system of disability benefits adjudication).

*Conclusion*

Both the Commissioner's RFC determination and his conclusion at step five are not supported by substantial evidence in the record.   Further development of the record is unnecessary and there are no outstanding issues to be resolved before a determination of disability can be made.  Accordingly, the decision of the Commissioner is REVERSED and this case REMANDED for immediate payment of benefits.

DATED this 10th day of January, 2022.

_____
JOHN V. ACOSTA
United States Magistrate Judge